## THE STATE v. HARDISTER AND BROWN.

1. CRIMINAL LAW. *Homicide by mal-practice as a physician.*

For a mere mistake of judgment in the selection and application of remedies, resulting in the death of his patient, a physician is not criminally liable; but when death is caused by gross ignorance in the selection or application of remedies, by one grossly ignorant of the art he assumes to practice, he is criminally liable.

ERROR to *Sharp* Circuit Court.
Hon. L. L. MACK, Circuit Judge.

### STATEMENT.

A demurrer was sustained by the Sharp Circuit Court, to the following indictment, and the State brought error:

" The grand jury of Sharp county, in the name and by the authority of the State of Arkansas, accuses Nathan G. Hardister and Henry W. Brown, of the crime of manslaughter, committed as follows, to-wit: The said Nathan G. Hardister, on the twenty-seventh day of October, 1880, in the county and State aforesaid, then and there being a physician, surgeon, and obstetrician, holding himself out to the public as

such, and soliciting patronage, then and there, in the county and State aforesaid, as such physician, surgeon, and obstetrician, and by reason of the said Nathan G. Hardister so holding himself out as such physician, surgeon, and obstetrician, as aforesaid, was, on the day and year last aforesaid, and in the county and State aforesaid, then and there being called in the capacity of physician, surgeon, and obstetrician, to attend upon one Amanda Saunders, being a married woman, and then and there being pregnant with a quick child, and in the labor of child-birth; the said Nathan G. Hardister did, then and there, feloniously, and without due caution and circumspection, make an assault upon the said Amanda Saunders, and then and there, feloniously, and without due caution and circumspection, and by mal-practice, did administer to her, the said Amanda Saunders, while in the pains of child-birth, as aforesaid, a large quantity of morphine; being unnecessary, not required, and wholly unauthorized, and the quantity so administered being excessive; and by reason of the administering of the morphine aforesaid, the said labor pains were retarded, interfered with, and allayed, and the said Amanda Saunders made nervous, delirious, and prostrated with a fever; and thereupon the said Nathan G. Hardister, feloniously, and without due caution and circumspection, and by mal-practice, did administer to her, the said Amanda Saunders, large and excessive quantities of fluid extract of ergot; and by reason of the administering of the said ergot, in excessive quantities, as aforesaid, by the said Nathan G. Hardister, he then and there caused the said Amanda Saunders to have convulsions; and thereupon the said Nathan G. Hardister, then and there, feloniously, and without due caution and circumspection, did bleed the said Amanda Saunders in the arm; which bleeding was, then and there, unnecessary and unauthorized.

And the said Nathan G. Hardister did, then and there, feloniously, and without due caution and circumspection, attempt to deliver said quick child from the said Amanda Saunders, by the use of forceps, by repeatedly introducing them, without due caution and circumspection, into the body of said Amanda Saunders; and by the unauthorized use of the forceps, produced an inflammation in the body of the said Amanda Saunders; which inflammation, so produced, by the unauthorized use of the forceps, aforesaid, caused the said Amanda Saunders to have fever; and the said Nathan G. Hardister did, then and there, feloniously, and without due caution and circumspection, administer to said Amanda Saunders, large and excessive quantities of chloroform, which administering of the said chloroform, in such excessive quantities, was unnecessary and unauthorized; and then and there, feloniously, without due care and circumspection, with a certain pocket-knife, did cut, puncture, penetrate and wound the said quick child, in the head, thereby, then and there, feloniously killing said quick child, before its delivery from its mother, the said Amanda; the killing of the quick child aforesaid being unnecessary and wholly unauthorized; causing great irritation and inflammation of the body of her, the said Amanda Saunders, and other great injuries to the body and person of the said Amanda Saunders, then and there did; and then and there, feloniously, and without due caution and circumspection, did insert his fingers into the mouth of the said quick child, and force its head out of the mouth of the vagina of the said Amanda Saunders; and then and there, without due caution and circumspection, feloniously did tie a rope around the neck of said child, killed as aforesaid, and, with force and violence, and without due caution and circumspection, feloniously did pull and deliver said child

from the womb of said Amanda Saunders; and the delivery of said child was unnecessary and wholly unauthorized.

And the said Nathan G. Hardister, then and there, without delivering the afterbirth from the said Amanda Saunders, feloniously, without due caution and circumspection, did abandon her, the said Amanda Saunders, leaving her in a prostrated, delicate, and precarious condition; and from the effect of the treatment, as aforesaid, by the said Nathan G. Hardister, she, the said Amanda Saunders, did languish from the twenty-seventh day of October, 1880, in the county and State aforesaid, and languishing did live until the third day of November, 1880, in the county and State aforesaid; on which said third day of November, A. D. 1880, from the effect of the said treatment and mal-practice of the said Nathan G. Hardister, she, the said Amanda Saunders, did die. And so the grand jury aforesaid, in the name and by the authority aforesaid, do say that the said Nathan G. Hardister, on the twenty-seventh day of October, 1880, in manner and form as aforesaid, her, the said Amanda Saunders, feloniously, and without due caution and circumspection, did kill and slay, against the peace and dignity of the State of Arkansas.

And the grand jury aforesaid, in the name and by the authority aforesaid, do further charge that, on the said twenty-seventh day of October, A. D. 1880, in the county and State aforesaid, the said Henry W. Brown, then and there being a physician, surgeon, and obstetrician, and holding himself out to the public as such, and soliciting patronage as such, was, in the capacity of such surgeon, physician, and obstetrician, called in to consult with and assist the said Nathan G. Hardister, in the treatment of the said Amanda Saunders, as aforesaid, feloniously, and without due caution and circumspection, abetting, aiding, and assisting the said Nathan G. Hardister, the said Amanda

Saunders then and there to kill and slay, in manner and forms as aforesaid, against the peace and dignity of the State of Arkansas."

*C. B. Moore*, Attorney-General, for the State.

We have no Statute directly bearing upon mal-practice and death caused thereby, but *Sec*. 1266, *Gantt's Dig.*, provides that killing another by a person " in the prosecution of a lawful act, done without due caution and circumspection," shall be manslaughter.

The indictment was good. *Wharton on Homicide*, 131-144; *Archbold Cr. Law and Plead., Vol*. 2, 221, *and notes.*

ENGLISH, C. J. Appellees were indicted in the Circuit Court of Sharp county, for manslaughter; a demurrer was sustained to the indictment; they were again indicted for the same offense; a demurrer was sustained to the second indictment, and the State appealed.

It may be seen from the reporter's copy of the indictment, that appellees were accused of causing the death of a woman, by mal-practice as physicians.

The demurrer to the indictment was general, the only cause assigned being that it did not state facts sufficient to constitute a public offense.

It is manifest, from words used in the indictment, that it was drafted under the second clause of *section* 1266, *Gantt's Dig.*, the whole section being: " If the killing be done in the commission of an unlawful act, without malice, and the means calculated to produce death, *or in the prosecution of a lawful act, done without due caution and circumspection, it shall be manslaughter.*" The preceding section defines voluntary manslaughter, and the section copied is, in

69—38

substance, the common law definition of involuntary man-slaughter, which, by our law, is a felony, and punishable by imprisonment in the penitentiary for a period not exceed-ing twelve months. *Ib.*, *sec.* 1278.

The indictment charges, in substance, that appellees, holding themselves out as physicians, etc., were called to attend Mrs. Saunders, and that they feloniously, and without due caution and circumspection, and by mal-practice, in the use of the remedies and appliances described, and, finally, by abandonment, caused her death.

Sir MATTHEW HALE said: "If a physician gives a per-son a potion, without any intent of doing him any bodily hurt, but with an intent to cure or prevent a disease, and contrary to the expectation of the physician, it kills him, this is no homicide ; and the like of a chirurgeon.  And I hold their opinion to be erroneous, that think, if he be no licensed chirurgeon or physician, that occasioneth this mis-chance, that then it is felony ; for physic and salves were before licensed physicians and chirurgeons ; and therefore, if they be not licensed according to the Statute. (3 *H.* 8. *Cap.* 11 or 14 *H.* 8. *Cap.* 5), they are subject to the pen-alties in the Statutes ; but God forbid that any mischief of this kind should make any person, not licensed, guilty of murder or manslaughter.  These opinions, therefore, may serve to caution ignorant people not to be too busy in this kind with tampering with physic, but, are no safe rule for a judge or jury to go by," etc.  1 *Hales' Pleas of the Crown*, 429.

In note 6, first American Edition of HALE, by Stokes & Ingersoll, the annotators say: "Later authorities agree with HALE in these points.  If a person, whether he be a regular practitioner or not, honestly and *bona fide*, perform an operation which causes the patient's death, he is not

:guilty of manslaughter. But if he be guilty of criminal misconduct, arising from gross ignorance or criminal inattention, then he will be guilty of manslaughter," citing ·cases.

Sir WILLIAM BLACKSTONE said : "If a physician or surgeon gives his patient a potion or plaister to cure him, which, contrary to expectation, kills him, this is neither murder nor manslaughter, but misadventure, and he shall not be punished criminally, however liable he might formerly have been to a civil action for neglect or ignorance. But it hath been holden that if he be not a regular physician or surgeon, who administers the medicine, or performs the operation, it is manslaughter at least. Yet Sir MATTHEW HALE very justly questions the law of this determination." 2 Black Com. Book 4, p. 197.

In 1809, SAMUEL THOMPSON, the father of the botanical, ·or steam system of medicine, was indicted in the Supreme ·Court of Massachusetts for murder, and the court charged :the jury that, "if one, assuming the character of a phy-.sician, through ignorance, administer medicine to his patient, ·with an honest intention and expectation of a cure, but ·which causes the death of the patient, he is not guilty of a ·felonious homicide." Commonwealth v. Thompson, 6 Mass. R., 134.

This case was followed in 1844, in Rice v. State, 8 Missouri, 561.

But in an edition of the Massachusetts Reports in 1850, in a note to Commonwealth v. Thompson, the editor says : ·"If death ensue from the gross ignorance, carelessness, negligence, or rashness of any one who undertakes to administer medicine, without any intent to do harm, the ·offense has often been held by eminent judges, to amount to manslaughter," and after citing the later English decisions

to sustain this proposition, the editor adds : "And this not only seems to be sound, but wholesome doctrine."

In *March* v. *Davison*, 9 *Paige*, 587, Chancellor WAL-WORTH, commenting on *Commonwealth* v. *Thompson*, said : "Our Statute does indeed, prohibit persons, not authorized by law, from practicing physic or surgery in this State (New York). And as the person who should attempt to practice contrary to the Statute, would be engaged in an unlawful act, he could not probably escape a conviction of manslaughter if he should kill a patient, even where he supposed the remedy administered was not dangerous to health or life," etc.

In *Rex* v. *Williamson*, 3 *Carrington & Payne*, 635, the prisoner, a man-midwife, tore away a part of the pro-lapsed uterus of a woman whom he had delivered of a child, supposing it to be a part of the placenta ; the woman died, and he was indicted for murder. Lord ELLENBOROUGH, C. J., in summing up, said to the jury : "There has not been a particle of evidence adduced which goes to convict the prisoner of the crime of murder ; but still it is for you to consider whether the evidence goes so far as to make out a case of manslaughter. To substantiate that charge, the prisoner must have been guilty of criminal misconduct, arising either from the grossest ignorance or the most crimi-nal inattention. One or other of these is necessary to make him guilty of that criminal negligence and misconduct, which is essential to make out a case of manslaughter," etc., etc.

In *Rex* v. *Long*, 4 *Carrington & Payne*, 398, it was held that a person acting as a medical man, whether licensed or unlicensed, is not criminally responsible for the death of a patient, occasioned by his treatment, unless his conduct is characterized either by gross ignorance of his art, or gross inattention to his patient's safety.

In another indictment against *Long, Ib.*, 423, it was held, that when a person undertakes the cure of a disease (whether he has received a medical education or not), and is guilty of gross negligence in attending his patient, after he has applied a remedy, or of gross rashness in the application of it, and death ensues in consequence of either, he is liable to be convicted of manslaughter.

In *Rex* v. *Speller*, 5 *Carrington & Payne*, 332, held that any person, whether a licensed medical practitioner or not, who deals with the life or health of any of his Majesty's subjects, is bound to have competent skill, and is bound to treat his or her patients with care, attention and assiduity, and if a patient dies for want of either, the person is guilty of manslaughter.

The English cases, those cited above and others, are reviewed in *Roscoe's Criminal Evidence*, 717–20.

Mr. GREENLEAF, in treating of involuntary manslaughter, says: "If the act be in itself lawful, but done in an improper manner, whether it be by excess, or by culpable ignorance, or by want of due caution, and death ensues, it will be manslaughter. Such is the case where death is occasioned by excessive correction given a child by the parent or master, *or by ignorance, gross negligence, or culpable inattention or maltreatment of a patient on the part of one assuming to be his physician*," etc. 3 *Greenleaf's Evidence, secs.* 128–9.

See also *Wharton's Law of Homicide*, 131–144; 2 *Bishop's Cr. L.*, *6th Ed. secs.* 664–686.

The court is of the opinion that the indictment in this case is sufficient. Whether appellees are criminally responsible for the death of Mrs. Saunders, must depend upon the evidence. A felonious want of "due care and circumspection" in her treatment, must be proved as alleged. For a mere mistake of judgment in the selection and application

*Physician not liable for mistake of judgment, but is for gross ignorance.*

of the remedies and appliances, named in the indictment, they would not be criminally liable. Were they grossly ignorant of the art which they assumed to practice? Did they manifest gross ignorance in the selection or application of the remedies? Were the remedies unusual, inapplicable, or rashly applied? Were appellees grossly negligent or inattentive? These are all questions of evidence.

The judgment must be reversed, and the cause remanded for further proceedings.

---

NOTE.—The judgment of the court was made up in this case and the opinion prepared, and concurred in by Hon W. M. HARRISON, before he left the bench.