McGough v. State.

Opinion delivered May 31, 1915.

1.   Homicide—voluntary manslaughter.—When death results from a voluntary act, and the killing was intentional and resulted from means calculated to produce death, the crime is not involuntary manslaughter, but is voluntary manslaughter, or some higher degree of criminal homicide.

2.   Criminal law—conviction for lesser crime.—The fact that a jury returned a verdict finding the accused guilty of a lower degree of the offense charged than that which the evidence justified, does not warrant the setting aside of the verdict by the appellate court, for it is an error of the jury of which the accused can not complain, for the reason it inured to his benefit.

3.   Homicide—degree—instruction as to form of verdict—lesser crime.—In a prosecution for homicide the court gave no instruction on the crime of involuntary manslaughter, but in instructing the jury the court instructed them as to the form of verdict in

case they found defendant guilty of involuntary manslaughter. *Held*, under the facts of the case, the defendant was not prejudiced by this action of the court.

4. HOMICIDE—EVIDENCE OF THREATS.—In a prosecution for homicide proof of threats is admissible only to aid in determining who was the aggressor, and to throw light on the state of mind of the accused at the time he fired the fatal shot; threats are to be considered for no other purpose, and it is not improper to tell the jury so.

Appeal from Drew Circuit Court; *Turner Butler*, Judge; affirmed.

*Knox & Knox* and *Williamson & Williamson*, for appellant.

1. There is absolutely no evidence tending to prove involuntary manslaughter, nor any evidence to sustain such a verdict. 71 Ark. 459; 99 *Id.* 188; 32 *Id.* 552; Kirby's Digest, § 1779; 21 Cyc. 760-2.

2. It was error for the court to instruct the jury on involuntary manslaughter. The error was not invited by appellant. 71 Ark. 86; 80 *Id.* 225; 82 *Id.* 25; 95 *Id.* 104; 74 *Id.* 262; 75 *Id.* 142; 73 *Id.* 262; 173 S. W. 852; 102 Ark. 266; 85 *Id.* 514; 103 *Id.* 505; 88 *Id.* 448; 77 *Id.* 464; 36 *Id.* 293; 156 U. S. 51. The error was prejudicial. 15 Sup. Ct. Rep. 294; 130 S. W. 1107; 131 *Id.* 551; 46 Wis. 516; 43 Tex. Cr. 407.

3. Especially was it prejudicial error without defining the crime of involuntary manslaughter. 71 Ark. 367, 372; Const., art. 7, § 23.

4. The court erred in giving the seventh instruction requested by the State, as to threats, and in the manner in which it permitted Walter Cruce's memory to be refreshed.

*Wm. L. Moose*, Attorney General, and *Jno. P. Streepey*, Assistant, for appellee.

1. The evidence was sufficient not only to sustain a verdict for involuntary manslaughter, but for a higher degree of homicide, and hence the instruction as to the lower degree was not prejudicial. 100 Ark. 330, 335. By its verdict the jury found defendant guilty of some de-

gree of homicide, and he can not complain because the verdict was too favorable to him. 68 Ark. 310-314; 71 *Id.* 86; 68 *Id.* 225; 82 *Id.* 25-27; 95 *Id.* 100; 96 *Id.* 58; 40 Ark. L. R. 303-307.

2.  Instruction No. 7, requested by the State as to threats, has been approved by this court in many cases.

3.  There is nothing in the record to show that witness Cruce was taken from the court room and "coached" as to how he should testify, but it is shown that the record from which he refreshed his memory was properly identified.

McCulloch, C. J.  Appellant was placed on trial in the circuit court of Drew County under the charge of voluntary manslaughter, and the jury returned a verdict finding him guilty of involuntary manslaughter. He is charged with killing his brother-in-law, one Guy Ferguson, and he admits the killing but pleads self-defense. Appellant is a farmer in Drew County and Ferguson was a tenant on appellant's farm. They had not gotten along well together at all times, there being some evidence of altercations occurring between them, and there is also proof of violent threats against appellant on the part of deceased.

Ferguson lived only a few hundred yards from appellant's house, where the killing occurred early one morning shortly after daylight. Ferguson went up to the house to get a wagon and team with which to do some hauling. No one was present except those two parties and appellant's wife, who, of course, did not testify in the case. Ferguson's wife testified about hearing the shot and finding the dead body of her husband when she went up to the house. She states that the body was lying on the ground outside the gate, his head being about ten feet from the gate. Other witnesses testified that when they reached the scene they found the body lying about fifteen or twenty feet from the gate. Other testimony tends to show that the gate was about ten steps from the gallery of the house. Defendant admitted that he shot Ferguson with a Winchester rifle, and undertook

to detail the altercation which led up to the killing. He said that he had another use for the wagon and team that morning and so informed Ferguson when the latter came up there to get them, and that Ferguson used vile epithets toward him and started toward the gate, and had one hand on the gate and was thrusting the other hand into his bosom when he (appellant) fired the shot. Appellant stated that he was standing on the gallery, and when Ferguson started toward the gate he stepped back in the door for the rifle and then walked out on the porch and fired the shot just as deceased put his hand on the gate. The following is the identical statement of the facts made by appellant:

"I went and told him that I would have to use them (the team of mules) and to let them alone. He said that 1 ought to let him use it and said, 'You son-of-a-bitch, I will go get my gun and kill you.' And I told him to go get it, and he said, 'No.' That he had gun enough here to kill me, and said, 'You son-of-a-bitch, I will kill you.' 1 went and got my gun and shot and he run to the tree and stood there a little and lay down."

Further on he explained about stepping back into the room or into the door to get the gun when deceased first made the statement that he would get his gun or had a gun. He stated also that when deceased thrust his hand into his bosom as he started to open the gate, he thought that deceased was going to shoot, and that that was the reason why he fired the shot. There was only one shot fired, and that was from the Winchester rifle, and the ball penetrated deceased's neck. He bled very freely, the blood being found scattered about on the dry leaves. A physician was immediately summoned and his testimony was that death was produced almost immediately from the result of the shot. His testimony also tends to show that there was no blood farther away than about three feet from the body. Deceased had no weapon except a common pocket knife which was in his pocket and unopened at the time the body was found. Appellant left the house by another gate as soon as he fired the shot and went over to one of his neighbors. He testified

that he didn't learn until some time afterward that the shot had killed deceased. According to the testimony of appellant himself, deceased was standing outside of the gate a distance of about ten steps, and according to the testimony adduced by the State the jury might have found on account of the situation of the body of deceased, and the distance of the blood stains, that deceased was several steps away from the gate on the outside at the time he received the fatal shot.

The only issue of fact in the case was whether or not appellant was justified in believing that his life was in danger so that the homicide may be excused. It is not contended that the evidence was not sufficient to have sustained a verdict of guilt of the crime of voluntary manslaughter, but it is insisted that there was no evidence to sustain a verdict of guilt of involuntary manslaughter and that the court erred in submitting that degree of homicide to the jury. The court gave correct instructions defining the crime of voluntary manslaughter, and also gave proper instructions on the doctrine of self-defense. No definition of the crime of involuntary manslaughter was given, but after the attorneys had concluded the argument of the case, the court, in giving final instructions to the jury concerning the form of the verdict, stated the form of verdict and extent of the punishment of both degrees of manslaughter, voluntary and involuntary. The record shows that appellant's counsel objected to the instruction of the court as to the form of the verdict as to involuntary manslaughter.

(1) There is no element of involuntary manslaughter in this case, and the verdict was not responsive to the evidence nor to the instructions of the court which undertook to state the law applicable to the case. Involuntary manslaughter is defined by the following statute: "If the killing be in the commission of an unlawful act, without malice, and without the means calculated to produce death, or in the prosecution of a lawful act, done without due caution and circumspection, it shall be manslaughter." Kirby's Digest, § 1779. That is substan-

tially the common law definition of involuntary manslaughter. *State* v. *Hardister,* 38 Ark. 605; *Edwards* v. *State,* 110 Ark. 590. According to the undisputed testimony, the death of Ferguson resulted from the voluntary act of appellant in firing the gun at him. That being true, the question of involuntary manslaughter is not involved. Where death results from a voluntary act, and the killing was intentional and resulted from means calculated to produce death, the crime is voluntary manslaughter or some higher degree of criminal homicide. It is not involuntary manslaughter. Wharton on Homicide (3 ed.), § 6.

(2-3) The fact, however, that the jury returned a verdict finding the accused guilty of the lower degree of the offense than that which the evidence justified does not warrant this court in setting aside the verdict, for it is an error of the jury of which the accused can not complain, for the simple reason that it inured to his benefit. If he was guilty at all, it was of the higher offense, and the fact that the jury reduced the offense is a matter about which he can not complain if the evidence was sufficient to sustain the higher offense. There are numerous decisions of this court which hold to that effect. But it is insisted that the rule is different where the trial court gives an instruction on the lower offense and there is no evidence to sustain it; the argument being that the jury may have been misled by the submission of the issue, and after reaching the conclusion that the accused was innocent of the higher offense charged, were induced by the misleading instruction to return a verdict of guilty of the lower offense. Counsel rely upon the following statement found in the opinion of this court in *Ringer* v. *State,* 74 Ark. 262: "On the other hand, if there is no evidence to show that the defendant is guilty of a lower degree of homicide than murder or voluntary manslaughter, the judge should refuse to instruct in reference to involuntary manslaughter; for to submit the question of whether a defendant is guilty of involuntary manslaughter in a case where there is nothing to show that the homicide was unintentional would be very likely to mislead the

jury.'' Without undertaking to decide whether an instruction erroneously given on a degree of offense not sustained by any evidence could in any case be prejudicial where the verdict was for the lower offense, we think it is quite clear in the present case that it was not prejudicial; and since we conclude that no prejudice resulted, it would not be proper for us to reverse the case on account of technical error in the instruction. It must be remembered now that the court gave no instructions defining the degree of involuntary manslaughter, and the only error was in referring to the form of the verdict in such a case. So, if the jury gave heed to the instructions of the court (which we should indulge the presumption that they did), they found that defendant did not act upon the appearance of danger so as to be justified, and that he was guilty of some degree of criminal homicide. That being true, the only effect of the erroneous instruction of the court concerning the form of the verdict was to induce the jury to return a verdict for the lower offense, and that was not prejudicial to appellant. In other words, he was not prejudiced, but got the benefit of the erroneous suggestion of the court about the form of the verdict. It might be different if there had been an erroneous instruction defining the offense of involuntary manslaughter and submitting the issue to the jury whether there was sufficient evidence to constitute that crime within the definition given; but, as before stated, no such instruction was given in this case, and when we indulge the presumption that the jury followed the instructions of the court we necessarily reach the conclusion that the jury properly found that the defendant was not acting in self-defense or upon the appearance of danger and was guilty of an unlawful homicide, which, under the evidence, could not have constituted any offense of a lower degree than voluntary manslaughter. We are of the opinion, therefore, that appellant was not prejudiced by the instruction of the court nor by the verdict of the jury.

(4) The only other assignment of error relates to the giving of the seventh instruction, which reads as fol-

lows: "You are instructed that the only purpose for which threats are admissible is to throw light on the defendant's act at the time he fired the shots, and to show who was the probable aggressor; and if you believe from the evidence as explained in these instructions that the deceased was not making any attempt to kill the defendant or to do him great bodily harm, as viewed from the standpoint of the defendant acting as a reasonable man, you will not consider threats, even if proved, for any purpose; and in this connection you are instructed that no threats, however violent, however great, are any provocation whatever."

The substance of the instruction is correct, but it is not very aptly phrased. It is a correct statement of law that proof of threats is admissible only to aid in determining who was the aggressor and to throw light on the state of mind of the accused at the time he fired the fatal shot. Threats are not to be considered for any other purpose, and it is not improper to tell the jury so. Doubtless the latter part of the instruction was intended to mean that threats alone, however violent, would not justify an assault or afford provocation for a homicide. No specific objection was made to the particular language of the instruction, and we think that while the instruction is not very aptly phrased it was not prejudicial in this case.

Judgment affirmed.