## BRIGHT *v.* STATE.

### Opinion delivered May 9, 1927.

1. CRIMINAL LAW—CONCLUSIVENESS OF VERDICT.—It is the province of the jury to weigh the testimony, and, when there is substantial evidence, the finding of the jury is conclusive on appeal.

2. WITNESSES—CROSS-EXAMINATION OF WITNESS.—In a liquor prosecution, the prosecuting attorney could cross-examine a witness, jointly indicted with defendant, as to statements made before the grand jury.

3. CRIMINAL LAW—QUESTIONS NOT RAISED BELOW.—Where the appellant did not object to questions asked at the trial, such questions will not be considered on appeal.

Appeal from Pulaski Circuit Court, First Division; *Abner McGehee,* Judge; affirmed.

*M. E. Dunaway* and *John D. Shackleford,* for appellant.

*H. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee.

MEHAFFY, J. The appellant, Bob Bright, was indicted and convicted in the Pulaski Circuit Court of the crimes of manufacturing liquor, possessing a still, and manufacturing mash, and his punishment fixed at imprisonment in the State Penitentiary for a period of one year in each case, the sentences to run concurrently. Defendant filed his motion for a new trial, which was overruled, and appeal prayed to this court and granted. Appellant was given 40 days in which to file his bill of exceptions.

Bob Brown, a witness for the State, testified in substance that he is a deputy sheriff of Pulaski County, has lived in Little Rock about 15 years, and has been deputy sheriff three years. That he had known the defendant about 25 years. Witness was formerly in the sawmill business, and defendant lives back of the old mill place. He knew him long before he was a deputy. He found and destroyed a still out west of town a month or two ago. A deputy sheriff named Geyer was with him at the time. Both were active deputies. They located the still between 8 and 9 miles west of Little Rock, on Rock Creek. They went out there about the 14th of October and found the still. They had information that the still was out there. It was in operation when they got there. Gene Voque and the defendant were both standing in front of the still. He saw them when he was about 50 or 60 yards away, and watched them for a few minutes. Went up and told them not to run, hollered at them to stick up their hands, and Bright ran, and Voque stopped. Bright got away.

It was an 80-gallon copper still, full of mash. It was working and running off, and a fire was under it. That he didn't know how much mash there was, but they had

emptied two barrels of mash in the still. The still would hold a barrel and a half of mash, but did not know how much was in the still. It was running and cooking. They were using pine knots for fuel. The still was about three-quarters of a mile northwest of Bright's house. That they watched them about ten minutes before they came up. They were both standing there, laughing and talking. No one else was there but those two. There is a road from Bright's house to Red Bank, which is a little more than a fourth of a mile from the still. There was a good spring at the still. There was a trail leading from Red Bank where they drove the car up to the still. Defendant had a car, a little Ford truck. The road crosses the creek, and there was evidence of car-tracks crossing the creek and stopping. There was a regular turning-around place. The road went up to Bright's house. Red Bank is about half a mile from Bright's house. Voque lives about a mile and a half from the still and about three-quarters of a mile from Bright. Witnesses brought Voque into town with them, and he was released on bond. They went next day to Bright's house, and he ran from Brown when he saw him. Went out the back way over the fence. Brown hollered to Geyer to stop him, and he ran back north through the woods. They went over to Voque's house to serve summons on him, and, while Geyer was in the house and witness was sitting in a car outside, Bright drove up in a car with Voque's brother, and, when he saw witness, he jumped out of the car before it stopped, and ran. They never arrested Bright. He afterwards came in and gave up. Bright's house is the last house on the road to Red Bank.

Witness testified that he was put on pay as a deputy when Mike Haynie went out. Before that he was in the timber business, but served as a deputy, and got paid once in a while. He served papers a time or two and several times on several occasions. He helped them make raids. The main thing he was interested in was the whiskey proposition. He is very antagonistic to it. He

was interested in breaking up the whiskey business. In the last three years he has probably made 40 or 50 raids. Had been on pay 35 days and has captured 10 stills and made 18 arrests. When he went out there he was looking for a still. They had information there was one in that locality. They got within about three-quarters of a mile of the still, and then walked the rest of the way. They first discovered the still about 60 yards away. That when he first saw it he did not know who was operating it. He got up about 20 or 30 steps and watched them, and hollered at them not to run. At that time they were not over 15 steps from them. Witness testified that this was not the first time Bright had run away from him. He stated he never had anything against Bright and never had any trouble with him. Witness said that he knew Bright was guilty of some violation of the law. Witness knew it was Bright. As long as he had known him he could not be mistaken. He did not shoot at him. He shot up in the air. He said that he could have hit him if he had wanted to. He saw Bright in the court room this morning, but did not point him out to Geyer. Voque ran only about ten feet from the still. Both started to run, and Voque stopped, and the other fellow did not stop.

Witness said he knew Voque, and was positive about it. Had known him ever since he was a kid. Never tried to arrest Voque before. Arrested his brother one time.

W. F. Geyer, another deputy sheriff, testified to substantially the same facts testified to by Brown. He stated that he did not know Bright's name at the time, but knew that the defendant was the man he saw at the still. This witness did not know Bright before, but saw him once before when Bright ran for Voque's house. When witness saw these men at the still he saw their faces; they turned and looked at the officers, and then started to run.

Gene Voque, witness for the defendant, testified that he had known Bright all his life; that Brown and Geyer

arrested him at the still. Witness is 22 years old, and lives with his father. The still is about two miles from his home. It was an 80-gallon copper still. They found him with 10 gallons of whiskey. Officers were about 20 or 25 yards away when they were first discovered. He knew Brown, but did not know the other fellow. When the fellow that was with Brown asked him who was with him, he told him Davis. He did not tell them it was Bright. He said it was Roy Davis with him.

This witness testified that Bright was not there, and he was cross-examined at length by the prosecuting attorney and asked about his testimony before the grand jury. He admitted that he testified that he went over to the still and got caught, and told them he went over there to get a drink, and had nothing to do with the still. That he told them that to defend himself. That he also told the grand jury that he had told the officers it was Bright when they caught him. That he did not know why he did that. Testified that he did not tell the officers it was Bright when they came out, but he told the grand jury that he had told them that. That he told the officers when they arrested him that it was Davis. When he stated before the grand jury that he told the officers it was Bright he was excited and did not know what to tell them. That he did not tell the truth about it before the grand jury. That the still belonged to him and Davis. Witness did not know where Davis stayed in town. Had never asked him. After witness met Davis in town he always came out there. Davis was to furnish everything and give witness $3 a gallon for his part. That this is the first whiskey he had made on that place. That he and his brother lived together. That when he testified before the grand jury he was trying to protect himself, and he was now telling the truth.

Frank Doll testified that he had some work for appellant, and thought that witness was at his place in the morning. That appellant was there all day the day he did the work. He was not there the next day. Could

not remember when he had the work, whether it was Wednesday, Thursday, or Friday.

The appellant testified about where he lived; that he had lived there for six years; born and raised out in that country, and lived there all his life. Runs a milk dairy, sells a little wood; that he is buying his own home, and has a wife and nine children. The oldest is 17, and the others are younger. Has lived on the place he is now trying to buy about a year. Knows nothing about the still, and was not there when the officers arrested Voque. That he was over on the Hot Springs road that day, getting his car fixed. Exhibits of bills for repairs showed that he was correct, and that he paid it on October 14. The first appellant knew about him being charged with it was when he saw it in the paper the day afterwards, and the day before he was at the garage all day having his car fixed. His wife asked the officers if they had a warrant, and he was figuring on coming to town to make his bond, because he did not want to be locked up in jail. That Brown had been gouging after him. Had him in court three or four times, telling what he was going to do to witness. Has known Brown 35 years. Brown told him some of the boys would fix him up for causing him to go four or five miles around with his logs. Had witness arrested two or three times, and testified against him. Had no idea how far the still was from his house. He figured it about a mile or a mile and a quarter where they said it was. He did not think there was any way to go to the still from his house. You could not go to Red Bank. They are going by his house every day to Red Bank. He never had any connection with Voque in the whiskey business. Has known him 20 or 25 years. Witness and his wife run a dairy. Most of the time his wife brings the milk to town. Brown never caught him at the still. Never caught him close to the still. Never knew there was a still there. Walked up on the officers chopping up the still, and came back where Brown and two revenue officers were chopping up the still. Witness told them he was hunting cows.

He did not run then. That he was not the one that ran away. He was fishing, and the officers asked him to show them the way out of the woods, and he showed them. He was down there fishing at night. Was never convicted in Federal court. Pleaded guilty one time, and was fined $25 for possessing liquor. They did not stick him for selling liquor to a butcher. He did not sell it to him. When Brown and Geyer came next day the reason he ran he did not want to be locked up, but wanted to make bond. Did not aim to be arrested. Does not know anything about Sexton coming after him. Did not remember the date that he heard about the arrest of Voque. Did not remember whether it was the day he had his car fixed or the day before. Never saw Geyer before. Saw Brown point witness to Geyer in the court room this morning.

John M. Whitfield testified, in substance, as follows: That he knew the appellant well. They lived near each other, and he saw him every day. That appellant operated a dairy, and that he was a farmer, and bore a good reputation as a law-abiding citizen. That he had never heard of him operating a still or being connected with it.

The appellant contends, first, that the testimony was not sufficient to sustain the verdict, and argues that the testimony of the character introduced should be weighed very carefully. This is true. It is, however, the province of the jury to weigh it, and, when there is substantial evidence, this court has many times held that the finding of facts by the jury is conclusive. We think there was sufficient evidence to sustain the verdict.

It is next contended by the appellant that it was error to permit the prosecuting attorney to examine a witness as to his testimony before the grand jury in a matter in which the witness and the defendant on trial are jointly indicted. The questions asked the witness were with reference to statements made before the grand jury, and it is earnestly contended that the case ought to be

reversed because the court permitted these questions to be asked.

"The first assignment of error upon which the defendant relies for a reversal of the judgment is that the court erred in allowing the prosecuting attorney to read to Elton Holwell and Mrs. Sarah Hopper extracts from their testimony before the grand jury and ask each of them if he had not made such statements. The extracts from the testimony before the grand jury were read to the witnesses for the purpose of refreshing their memory, and each one stated that he had given the testimony before the grand jury as read to him. In making this contention counsel for the defendant relies upon the case of *Browne* v. *State,* 168 Ark. 433, 270 S. W. 537. We do not think that case has any application. There the witness denied that he had testified differently before the grand jury from the testimony being given by him at the trial. Therefore the court held that it was improper to admit the purported evidence of the witness before the grand jury for the purpose of impeaching him, without first proof that the testimony offered was the correct testimony of the witness before the grand jury. In the case before us each witness admitted that the extract of the testimony before the grand jury had been given by him before that body, and stated further that such testimony was true. Thus it will be seen that the testimony was admissible, either for the purpose of contradicting the testimony given by the witnesses at the trial or as substantive testimony given by them at the trial, after refreshing their memory from the testimony given by them before the grand jury." *Crafford* v. *State,* 169 Ark. 225, 273 S. W. 13.

In the above case the witnesses were shown what was claimed to be their statements before the grand jury, and the contention was made that that was error. But in this case the prosecuting attorney simply questioned the witness about his statements before the grand jury, and the witness answered all the questions, telling how

he testified and giving his reasons for it. It was a proper cross-examination of the witness.

The appellant next argues that it was error to ask defendant certain questions, but he does not seem to have objected to these questions when asked. Appellant, in his motion for new trial, objects to two instructions, one on the question of reasonable doubt, and the other as to what constitutes possession of a still. Each of these instructions has been approved many times by this court, and there was no error in giving them. There was sufficient testimony to require the submission of the case to the jury, and the jury's finding is conclusive. The judgment is therefore affirmed.